

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE    OCT 1 8 2018
_____, CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Oct 18, 2018

_____ Deputy
for SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | No. 94556-0 |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN M. BASSETT, | ) | |
| | ) | Filed    OCT 1 8 2018 |
| Respondent. | ) | |
| | ) | |

OWENS, J. — At issue here is the constitutionality of sentencing juvenile offenders to life in prison without the possibility of parole or early release. The State appeals a Court of Appeals, Division Two decision holding that the provision of our state's *Miller*[1]-fix statute that allows 16- and 17-year-olds to be sentenced to life without parole violates the Washington Constitution's ban on cruel punishment. Brian Bassett, recently resentenced to life without parole under the *Miller*-fix statute, argued at the Court of Appeals that juvenile life without parole is categorically unconstitutional. The court adopted the categorical approach, rather than our

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

traditional *Fain* proportionality test, and found that sentencing juvenile offenders to life without parole or early release constituted cruel punishment. *State v. Bassett*, 198 Wn. App. 714, 744, 394 P.3d 430 (2017) (published in part); *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980). We affirm the Court of Appeals' decision and hold that sentencing juvenile offenders to life without parole or early release constitutes cruel punishment and therefore is unconstitutional under article I, section 14 of the Washington Constitution.

PROCEDURAL AND FACTUAL BACKGROUND

When Brian Bassett was 16 years old, he was living in a "shack" with Nicholaus McDonald after Bassett's parents "'kicked [him] out'" of their home. *State v. Bassett*, noted at 94 Wn. App. 1017, 1999 WL 100872, at *1. With McDonald's assistance, Bassett snuck back into his home and shot his mother and father. *Id.* His brother was drowned in the bathtub, an act that McDonald initially confessed to but later blamed on Bassett at trial. *State v. McDonald*, 138 Wn.2d 680, 684, 981 P.2d 443 (1999). Bassett was convicted of three counts of aggravated first degree murder for the deaths of his mother, father, and brother. The judge commented that Bassett, still a child, was "a walking advertisement" for the death penalty and sentenced him to three consecutive terms of life in prison without the possibility of parole. Clerk's Papers at 19. At this time, 1996, life without parole was the mandatory sentence under our state statute. Former RCW 10.95.030 (1993).

2

After nearly two decades in prison, Bassett had another chance at sentencing in light of the Supreme Court's *Miller* decision. 567 U.S. 460. In *Miller*, the Court held that mandatory juvenile life without parole sentences were unconstitutional under the Eighth Amendment to the United States Constitution. *Id.* at 479. It reasoned that because a mandatory juvenile life without parole scheme did not consider the nature of youth and "children's diminished culpability and heightened capacity for change," it "poses too great a risk of disproportionate punishment." *Id.* It noted that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* This decision is one from a line of cases wherein the Court curtailed states from imposing the harshest punishments against juveniles. *See Montgomery v. Louisiana,* ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016) (holding that *Miller* announced a new substantive constitutional rule that was retroactive); *Graham v. Florida,* 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (barring life without parole sentences for juveniles convicted of nonhomicide offenses); *Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (barring capital punishment for juvenile offenders).

In response to *Miller,* our state legislature enacted what is referred to as the *Miller*-fix statute. RCW 10.95.030. It requires sentencing courts to consider the *Miller* factors before sentencing a 16- or 17-year-old convicted of aggravated first degree murder to life without parole. *Id.* The statute provides that "the court must

3

take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated." RCW 10.95.030(3)(b). The statute mandated that individuals who had been sentenced to juvenile life without parole under the former mandatory scheme, such as Bassett, be resentenced under this new statute. RCW 10.95.035.

Bassett, at 35 years old, appeared for resentencing pursuant to the *Miller*-fix statute in 2015. Bassett requested three concurrent 25-year sentences and submitted over 100 pages of mitigation documentation, including evidence that he had been rehabilitated since his days as a teenager.

A pediatric psychologist who treated Bassett prior to the murders shed light on Bassett's childhood and life experience. He testified that Bassett had suffered from an adjustment disorder, struggling to cope effectively with the stressors of homelessness and his strained relationship with his parents. The psychologist testified that during a family counseling session, Bassett attempted to reconcile with his parents, expressing a desire to come back home, but his parents rejected the idea. Bassett addressed the court and stated that at the time of the crimes he was unable to "comprehend the totality" and "see the long-term consequences of [his] actions." Verbatim Report of

Proceedings (VRP) at 79. He said that when he was taken to jail on suspicion of murdering his parents, his first thoughts were "how much trouble [he] was going to be in when [his] parents learned that [he] was there in jail." VRP at 79-80.

Bassett also submitted significant evidence demonstrating how he has matured emotionally and behaviorally. He successfully completed courses examining stress and family violence in order to, as his brief states, "better understand his crimes." Br. of Resp't at 3 n.6. He has not had any prison violations since 2003, and the Department of Corrections classified him as a moderate-to-low security risk. He earned his GED (general equivalency diploma) and a full tuition scholarship for college, and was on the Edmonds Community College honor roll. Many letters from Bassett's supporters stated that he serves as a mentor to other men in prison. He married Joanne Pfeifer in 2010 after premarital counseling.

The State did not present any evidence rebutting Bassett's mitigating information. The sentencing judge rejected most of the mitigation evidence and imposed three consecutive life without parole sentences.

Bassett appealed, arguing, among other things, that Washington's *Miller*-fix statute violated article I, section 14 because life without parole was categorically a cruel punishment for juvenile offenders. *Bassett*, 198 Wn. App. 714. The State did not address this argument in its briefing or at oral argument, and so the court ordered the State to file a supplemental brief responding to this argument.

The Court of Appeals held in the published portion of its opinion that juvenile life without parole was categorically unconstitutional under article I, section 14. *Id.* at 744. The court came to this conclusion by adopting the categorical bar analysis, a framework used by the United States Supreme Court and, most recently, by the Iowa Supreme Court to assess the categorical challenges against juvenile sentences. *Id.* (referencing *Graham*, 560 U.S. at 82; *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016)). In the court's unpublished portion of the opinion, it dismissed Bassett's remaining arguments, including his claim that the sentencing court erred in applying the *Miller* factors. *Bassett*, No. 47251-1-II, slip op. at 30-36 (Wash. Ct. App. Apr. 25, 2017) (unpublished), http://www.courts.wa.gov/opinions/.

The State petitioned our court for review, arguing that the Court of Appeals' decision "ignore[d] the history of juvenile sentencing in Washington and abandon[ed] [*Fain*,] Washington's long-standing framework for evaluating cruel punishment under the state constitution[,] . . . in favor of the analysis of a foreign state court." Pet. for Review at 11-12. We accepted review of the State's petition and denied review of the issues raised by Bassett in his cross petition for review. *State v. Bassett*, 189 Wn.2d 1008, 402 P.3d 827 (2017).

## ISSUES

I.   Is article I, section 14 of the Washington Constitution more protective than the Eighth Amendment to the United States Constitution?

6

II.    Should this court apply the categorical bar analysis or the *Fain* proportionality

test to this constitutional challenge?

III.    Under the categorical bar analysis, does a juvenile life without parole sentence

violate article I, section 14 of the Washington Constitution?

IV.    Under the *Fain* proportionality test, does a juvenile life without parole sentence

violate article I, section 14 of the Washington Constitution?

## ANALYSIS

We must determine whether the Washington Constitution's ban on "cruel

punishment" prohibits sentencing juveniles to life without parole, rendering RCW

10.95.030(3)(a)(ii) unconstitutional. WASH. CONST. art. I, § 14. This subsection of

the *Miller*-fix statute provides that

> [a]ny person convicted of the crime of aggravated first degree murder for
> an offense committed when the person is at least sixteen years old but
> less than eighteen years old shall be sentenced to a maximum term of life
> imprisonment and a minimum term of total confinement of no less than
> twenty-five years. *A minimum term of life may be imposed, in which
> case the person will be ineligible for parole or early release.*

RCW 10.95.030(3)(a)(ii) (emphasis added). As the last sentence explains, when a

court imposes a maximum term of life and a minimum term of life, the sentence

becomes a life sentence without parole or early release.

We review a statute's constitutionality, like questions of law, de novo. *State v.

Hunley*, 175 Wn.2d 901, 908, 287 P.3d 584 (2012). We presume statutes are

7

constitutional, and Bassett has the burden to prove otherwise beyond a reasonable doubt. *Id.*

The State argues that the Court of Appeals "subverted the constitutional authority of a duly-elected legislature to fix punishments for criminal offenses" by holding juvenile life without parole unconstitutional. Revised Suppl. Br. of Pet'r at 18-20. It argues that the legislature had the opportunity to do away with juvenile life without parole after *Miller* and chose not to do so. *Id.* While the legislature surely is responsible for enacting appropriate sentences, this "authority is ultimately circumscribed by the constitutional mandate forbidding cruel punishment." *Fain*, 94 Wn.2d at 402. And as we have said before, while this constitutional decision "is not one which we assume eagerly, . . . we do not shrink from our responsibility." *Id.*

I.  *Under* Gunwall, *Article I, Section 14 Is More Protective Than the Eighth Amendment*

Our first step is to determine whether article I, section 14 of the Washington Constitution is more protective than its federal counterpart, the Eighth Amendment. The State argues that we must conduct a *Gunwall* analysis in order to answer this question. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). Bassett argues that our prior case law has consistently held that article I, section 14 is more protective.

This court has "repeated[ly] recogni[zed] that the Washington State Constitution's cruel punishment clause often provides greater protection than the

Eighth Amendment."[2] *State v. Roberts*, 142 Wn.2d 471, 506, 14 P.3d 713 (2000). However, there are four instances where we said this is not always so. First, in *Dodd*, we found that article I, section 14 was not more protective than the Eighth Amendment. *State v. Dodd*, 120 Wn.2d 1, 21, 838 P.2d 86 (1992). A few years later, we recognized that *Dodd* had unique facts as the capital defendant wanted to waive general review in hopes of a speedier execution and thus the "ruling in *Dodd* is limited to the facts of that case." *State v. Thorne*, 129 Wn.2d 736, 772 n.10, 921 P.2d 514 (1996); *see also State v. Manussier*, 129 Wn.2d 652, 674 n.89, 921 P.2d 473 (1996). Despite finding *Dodd* unique, we cited the decision in three death penalty cases for the proposition that the *Gunwall* factors do not always demand that we interpret article I, section 14 more broadly than the Eighth Amendment. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 731, 327 P.3d 660 (2014); *State v. Yates*, 161 Wn.2d 714, 792, 168 P.3d 359 (2007); *State v. Gentry*, 125 Wn.2d 570, 631-32, 888 P.2d 1105 (1995). With our inconsistent precedent, conducting the *Gunwall* analysis for this particular context is the prudent starting point for this case.

---

[2] *See State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014); *State v. Manussier*, 129 Wn.2d 652, 674, 921 P.2d 473 (1996); *State v. Rivers*, 129 Wn.2d 697, 712, 921 P.2d 495 (1996); *State v. Thorne*, 129 Wn.2d 736, 772-33, 921 P.2d 514 (1996), *abrogated on other grounds by Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); *State v. Bartholomew*, 101 Wn.2d 631, 639-40, 683 P.2d 1079 (1984); *Fain*, 94 Wn.2d at 392-93.

Moreover, we recently indicated that the *Gunwall* analysis should be conducted in the specific context of challenges to juvenile life without parole sentences. In *Ramos*, we agreed with Ramos that our court has repeatedly found that article I, section 14 is more protective than the Eighth Amendment. *State v. Ramos*, 187 Wn.2d 420, 453-54, 387 P.3d 650, *cert. denied*, 138 S. Ct. 467 (2017). Yet we noted that "[e]ven where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications." *Id.* at 454.

Thus, we use the six nonexclusive criteria from *Gunwall* to determine whether the Washington Constitution's ban on cruel punishment should be considered as extending broader rights to its citizens than the Eighth Amendment: (1) the textual language of the state constitution, (2) differences in the texts of parallel provisions of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) structural differences between the federal and state constitutions, and (6) matters of particular state interest or local concern. *Gunwall*, 106 Wn.2d at 61-62.

The first three factors provide cogent grounds for finding article I, section 14 more protective than the Eighth Amendment. The Washington Constitution provides that "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." WASH. CONST. art. I, § 14. This provision is similar to the

Eighth Amendment but omits the words "and unusual." U.S. CONST. amend. VIII

("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and

unusual punishments inflicted."). This difference indicates that "Article 1, section 14,

on its face, may offer greater protection than the Eighth Amendment, because it

prohibits conduct that is merely cruel; it does not require that the conduct be both

cruel and unusual." *Dodd*, 120 Wn.2d at 21. "The historical evidence reveals that the

framers of [Wash.] Const. art. 1, § 14 were of the view that the word 'cruel'

sufficiently expressed their intent, and refused to adopt an amendment inserting the

word 'unusual'." *Fain*, 94 Wn.2d at 393 (citing *The Journal of the Washington State

Constitutional Convention: 1889*, at 501-02 (Beverly Paulik Rosenow ed. 1962)).

Thus, these factors weigh in favor of interpreting article I, section 14 as affording

broader rights than the Eighth Amendment.

The fourth factor asks us to consider how "established bodies of state law,

including statutory law, may also bear on the granting of distinctive state

constitutional rights." *Gunwall*, 106 Wn.2d at 61. The State argues that this factor

does not favor independent state constitutional analysis, stretching its memory back to

the way our justice system treated children over 100 years ago and ignoring our trend

of affording more protections for juveniles. First, it points out that at statehood, we

had no juvenile courts and that our constitution is silent on juveniles. It cites two

decisions wherein our court approved death sentences for children, no doubt now an

11

unconstitutional and shameful practice, and notes that one of the defendants was executed when he was 17 years old. Our state's execution of a child, Walter Dubuc, in 1932, is not a guiding light for interpreting our constitution's ban on cruel punishment today in 2018. "We are not impressed by the implicit suggestion that the state of Washington should regress to territorial days and adopt a system where juveniles . . . are afforded no special protections." *State v. Schaaf*, 109 Wn.2d 1, 14-15, 743 P.2d 240 (1987). It is more instructive to look at how our jurisprudence on juvenile sentencing has evolved to ensure greater protections for children.

This court has consistently applied the *Miller* principle that "children are different." *Miller*, 567 U.S. at 481. In *O'Dell*, we used the psychological and neurological studies discussed in *Miller*, *Roper*, and *Graham* to hold that age may well mitigate a defendant's culpability, even if the defendant is slightly older than 18. *State v. O'Dell*, 183 Wn.2d 680, 691-96, 358 P.3d 359 (2015). In *Ramos*, we noted that *Miller*'s reasoning applies not only to literal juvenile life without parole sentences but also to de facto juvenile life without parole sentences. 187 Wn.2d at 438. This court has also applied *Miller*'s reasoning to hold that "sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant" and "must have discretion to impose any sentence below the otherwise applicable SRA range and/or sentence enhancements." *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017).

12

Our legislature has also demonstrated its "ongoing concern for juvenile justice issues." *Ramos*, 187 Wn.2d at 446 (citing RCW 9.94A.540(3) (eliminating mandatory minimum sentences for juvenile offenders tried as adults), .730 (expanding parole eligibility for juvenile offenders tried as adults)). After *Miller*, the legislature did away with life without parole sentences for children age 15 and under. RCW 10.95.030(3)(a)(i). Thus, we see that established bodies of state law, both statutory and case-based, recognize that children warrant special protections in sentencing. This weighs in favor of interpreting article I, section 14 more broadly than the Eighth Amendment.

The fifth *Gunwall* factor "will always point toward pursuing an independent state constitutional analysis because the federal constitution is a grant of power from the states, while the state constitution represents a limitation of the State's power." *State v. Young*, 123 Wn.2d 173, 180, 867 P.2d 593 (1994).

The sixth factor also weighs in favor of interpreting article I, section 14 more broadly than the Eighth Amendment. While there may be some benefit to national uniformity for sentencing children, it is outweighed by the state policy considerations discussed under the fourth factor, to grant juveniles special sentencing protections where appropriate. *See Gunwall*, 106 Wn.2d at 67 (explaining that the discussion of the fourth factor may pertain to the sixth factor).

13

The six *Gunwall* factors all direct us toward interpreting article I, section 14 more broadly than the Eighth Amendment. Thus, we hold that in the context of juvenile sentencing, article I, section 14 provides greater protection than the Eighth Amendment.

II. *The Categorical Bar Analysis Better Considers the Characteristics of the Offender Class Than the* Fain *Test*

The State argues that the Court of Appeals wrongly abandoned our traditional *Fain* proportionality analysis in favor of the categorical bar analysis, rooted in United States Supreme Court jurisprudence. The State is correct that our court has used *Fain* to analyze proportionality challenges under article I, section 14. *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014); *State v. Davis*, 175 Wn.2d 287, 344, 290 P.3d 43 (2012) *abrogated by State v. Gregory*, No. 88086-7 (Wash. Oct. 11, 2018), http://www.courts.wa.gov/opinions/pdf/880867.pdf; *Manussier*, 129 Wn.2d at 676-77. However, we are not bound to apply *Fain* to every cruel punishment claim under article I, section 14. While *Fain* is the traditional test, it has been used for claims that a sentence was grossly disproportionate, not that a sentence was categorically unconstitutional based on the nature of the juvenile offender class. Thus, this unique type of cruel punishment claim is distinguishable from our precedent adopting *Fain*, and we are free to choose the most appropriate framework for this case. *See Ramos*, 187 Wn.2d at 454-55 (explaining that we do not foreclose the possibility of following the Iowa Supreme Court's lead of adopting a categorical rule).

14

The *Fain* proportionality test considers (1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction. *Fain*, 94 Wn.2d at 397. The categorical bar analysis considers (1) whether there is objective indicia of a national consensus against the sentencing practice at issue and (2) the court's own independent judgment based on "'the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [cruel punishment provision]'s text, history, . . . and purpose.'" *Graham*, 560 U.S. at 61 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 421, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)).

The United States Supreme Court's jurisprudence on the categorical bar analysis is helpful in understanding why *Fain* should not be adopted here. The *Fain* framework does not include significant consideration of the characteristics of the offender class. Instead, it weighs the offense with the punishment. This makes it ill suited to analyze Bassett's claim because he asserts a categorical challenge based on the characteristics of the offender class—children. The categorical bar analysis, on the other hand, directs us to consider the nature of children. *Graham*, 560 U.S. at 67. The categorical approach "requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question" and whether the sentence "serves legitimate penological

15

goals." *Id.* Issues of culpability, the severity of the punishment, and whether penological goals are served all allow the court to include youth-specific reasoning into the analysis.

The United States Supreme Court developed the categorical framework to address categorical cruel punishment claims based on the nature of the offense or the characteristics of the offender. *Graham*, 560 U.S. at 59-62. In *Graham*, the Court explained that a framework that compares "the severity of the penalty and the gravity of the crime," which is what *Fain* does, does not advance an analysis of a claim that challenges "a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes." *Id.* at 61. Our circumstance differs slightly as we are assessing life without parole for juveniles convicted of the same crime. However, because Bassett's categorical cruel punishment claim is based on a particular type of sentence as it applies to an entire class of offenders—16- and 17-year-olds—a test that does not consider youthful characteristics should not be adopted. Moreover, adopting a framework that considers the characteristics of youth is in line with the *Miller* reasoning, which we have adopted. *See supra* Part I (discussion of the fourth *Gunwall* factor).

Understanding why we created the *Fain* test helps us appreciate why it is appropriate to adopt the categorical bar analysis for Bassett's constitutional challenge. The Fourth Circuit adopted the four-factor test when considering whether a life

sentence was disproportionate to the underlying offenses in a habitual criminal case. *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973). In *Fain*, we noted that this was the first time our court was expressly adopting proportionality principles and that the four factors in *Hart* were useful in analyzing a cruel punishment claim. *Fain*, 94 Wn.2d at 397 (noting that the factor on legislative purpose should be employed only with caution and was not necessary for Fain's case (*id.* at 401 n.7)). Thus, in *Fain*, we adopted a framework from a nonbinding court to analyze proportionality because it fit the challenge Fain brought—that Fain's sentence was cruel punishment because it was grossly disproportionate to his crimes—and the particular statute we were assessing— a habitual criminal statute. Similarly, here, the categorical bar analysis fits the challenge Bassett brings—that life without parole is a categorically unconstitutional sentence for juveniles—and the statute we are assessing—a juvenile life without parole statute.

In conclusion, though we have adopted *Fain* to assess other cruel punishment claims under our state constitution, it is inappropriate to assess Bassett's categorical challenge, which is based on the characteristics of children. We are free to evolve our state constitutional framework as novel issues arise to ensure the most appropriate factors are considered. Because the categorical bar analysis allows us to consider the characteristics of youth, the crux of this categorical challenge, we adopt it in this instance. This holding does not disturb our *Fain* decision.

17

III. *Under the Categorical Bar Analysis, Sentencing a Juvenile Offender to Life without Parole Constitutes Cruel Punishment*

a. *There Is a Strong and Rapid Trend of Abandoning Juvenile Life without Parole Sentences*

The first step in the categorical bar analysis is to determine whether there is a national consensus against sentencing juveniles to life without parole by looking at "'objective indicia of society's standards, as expressed in legislative enactments and state practice.'" *Graham*, 560 U.S. at 61 (quoting *Roper*, 543 U.S. at 563). "'[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Id.* at 62 (internal quotation marks omitted) (quoting *Atkins v. Virginia*, 536 U.S. 304, 312, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (applying the categorical bar analysis to find that a person with intellectual disabilities cannot be sentenced to death)). "It is not so much the number of these States that is significant, but the consistency of the direction of change." *Atkins*, 536 U.S. at 315.

Bassett is correct that the direction of change in this country is unmistakably and steadily moving toward abandoning the practice of putting child offenders in prison for their entire lives. As of January 2018, 20 states and the District of Columbia have abolished life without parole for juveniles.[3] This trend has occurred

---

[3] ALASKA STAT. § 12.55.015(g); ARK. CODE ANN. § 5-4-108; CAL. PENAL CODE §§ 3051, 4801; COLO. REV. STAT. §§ 17-22.5-104(2)(d)(IV), 18-1.3-401(4)(b)(I); CONN. GEN. STAT. § 54-125a(f); DEL. CODE ANN. tit. 11, §§ 4209A, 4204A(d); D.C. CODE § 22-

rapidly since *Miller*, before which only 4 states banned juvenile life without parole.[4]

Additionally, 4 states no longer have anyone serving a life without parole sentence

under their respective statutes.[5] Other states have limited the offenses that qualify for

juvenile life without parole.[6] Lastly, several states moved to provide parole eligibility

to those sentenced to juvenile life without parole pre-*Miller*.[7] There is a clear trend of

states rapidly abandoning or curtailing juvenile life without parole sentences. While

this step is not dispositive, it weighs in favor of finding that sentencing juvenile

offenders to life without parole is cruel punishment under article I, section 14. *See*

*Graham*, 560 U.S. at 80.

---

2104(a); HAW. REV. STAT. § 706-656; *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016); KAN. STAT. ANN. § 21-6618; KY. REV. STAT. ANN. § 640.040(1); *Diatchenko v. Dist. Att'y*, 466 Mass. 655, 674, 1 N.E.3d 270 (2013); NEV. REV. STAT. § 176.025; N.J. STAT. ANN. § 2C:11-3; N.D. CENT. CODE ANN. §§ 12.1-20-03(4), 12.1-32-13.1; S.D. CODIFIED LAWS § 22-6-1; TEX. PENAL CODE ANN. § 12.31; UTAH CODE ANN. § 76-3-209; VT. STAT. ANN. tit. 13, § 7045; W. VA. CODE ANN. § 61-11-23(a)(2); WYO. STAT. ANN. § 6-2-101(b).

[4] ALASKA STAT. § 12.55.015(g); COLO. REV. STAT. §§ 17-22.5-104(2)(d)(IV), 18-1.3-401(4)(b)(I); KAN. STAT. ANN. § 21-6618; KY. REV. STAT. ANN. § 640.040(1).

[5] *See Does Your State Still Use Life-without-Parole Sentences for Kids?*, CAMPAIGN FOR FAIR SENT'G OF YOUTH (Feb. 1, 2018) https://www.fairsentencingofyouth.org/does-your-state-use-juvenile-life-without-parole-jlwop/ [https://perma.cc/H3BW-YM3Y] (an update from February 2018, showing that Maine, New Mexico, New York, and Rhode Island do not use the sentence).

[6] FLA. STAT. § 921.1402(2)(a); 18 PA. CONS. STAT. §§ 1102, 1102.1; N.C. GEN. STAT. §§ 15A-1340.19A, 15A-1340.19B, 15A-1340.19C.

[7] MO. REV. STAT. § 558.047(1); COLO. REV. STAT. § 18-1.3-401(4)(b); *Jackson v. State*, 883 N.W.2d 272 (Minn. 2016).

b. *The Exercise of Independent Judgment Weighs in Favor of Finding Juvenile Life without Parole Cruel Punishment*

The second step in the categorical bar analysis, the judicial exercise of independent judgment, requires consideration of "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question" and "whether the challenged sentencing practice serves legitimate penological goals." *Graham*, 560 U.S. at 67.

The United States Supreme Court and this court have concluded that children are less criminally culpable than adults. As we have stated, we now "have the benefit of the studies underlying *Miller*, *Roper*, and *Graham* . . . that establish a clear connection between youth and decreased moral culpability for criminal conduct." *O'Dell*, 183 Wn.2d at 695 (citing the findings in *Miller* that a child's "transient rashness, proclivity for risk, and inability to assess consequences" lessen their culpability (*Miller*, 567 U.S. at 472)). "As compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Graham*, 560 U.S. at 68 (internal quotation marks omitted) (quoting *Roper*, 543 U.S. at 569-70). Because children have "lessened culpability they are less deserving of the most severe punishments." *Id.* Yet the *Miller*-fix statute allows children to be sentenced to the extremely severe punishment of life without parole.

20

The United States Supreme Court has recognized the harsh nature of sentencing a juvenile to die in prison. The Court explained that life without parole "alters the offender's life by a forfeiture that is irrevocable" and "deprives [individuals] of the most basic liberties without giving hope of restoration." *Id.* at 69-70. The sentence is "especially harsh" for children, who will "on average serve more years and a greater percentage of [their] li[ves] in prison than an adult offender." *Id.* at 70. The punishment "'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the child], he will remain in prison for the rest of his days.'" *Id.* (quoting *Naovarath v. State*, 105 Nev. 525, 526, 779 P.2d 944 (1989)).

Lastly, we look to whether the penological goals of retribution, deterrence, incapacitation, and rehabilitation are served by this sentence. "'[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes.*'" *Ramos*, 187 Wn.2d at 438 (quoting *Miller*, 567 U.S. at 472). First, the case for retribution is weakened for children because "'[t]he heart of the retribution rationale' relates to an offender's blameworthiness" and children have diminished culpability. *Miller*, 567 U.S. at 472 (alteration in original) (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 71-74). "Nor can deterrence do the work in this context, because 'the same characteristics that render juveniles less culpable than adults'—their

21

immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." *Id.* (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 72). Rehabilitation is not supported by a juvenile life without parole sentence because the sentence "'forswears altogether the rehabilitative ideal.'" *Id.* at 473 (quoting *Graham*, 560 U.S. at 74).

Lastly, incapacitation is not well served by sentencing juveniles to life without parole because "[d]eciding that a 'juvenile offender forever will be a danger to society' would require 'mak[ing] a judgment that [he] is incorrigible'—but 'incorrigibility is inconsistent with youth.'" *Id.* at 472-73 (second and third alterations in original) (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 72-73). The penological goal of incapacitation is especially concerning given the fact that the sentence "makes an irrevocable judgment about that person[ ]" that is at odds with what we know about children's capacity for change. *Graham*, 560 U.S. at 74. We have recognized that children have "'diminished culpability and heightened capacity for change.'" *Ramos*, 187 Wn.2d at 444 (quoting *Miller*, 567 U.S. at 479). While the *Miller*-fix statute requires sentencing courts to consider "youth's chances of becoming rehabilitated," it is extremely difficult to make that determination. RCW 10.95.030(3)(b). "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and

the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573.

Bassett's resentencing hearing provides an illustration of the imprecise and subjective judgments a sentencing court could make regarding transient immaturity and irreparable corruption. Some judges may find an infraction-free record from the last 12 years evidence of rehabilitation, but Bassett's judge concluded it didn't "carr[y] much weight" because "prisoners have some incentive to follow the rules." VRP at 90. He also found that Bassett's academic achievements were "less evidence of rehabilitation and more evidence that . . . he is simply doing things to make his time in prison more tolerable." *Id.* at 91. The judge concluded that Bassett's homelessness was evidence that he was more mature than "kids who are not in that situation." *Id.* at 89. This conclusion could have easily gone the other way, with a judge finding that the instability and insecurity of homelessness caused Bassett to have less control over his emotions and actions. Of course, sentencing courts use their expert discretion in many aspects of sentencing. However, in this situation, given the difficulty even expert psychologists have in determining whether a person is irreparably corrupt and the extremely high stakes of the decision—the difference between living out the rest of their lives in prison or having a chance to return to society—this type of discretion produces the unacceptable risk that children undeserving of a life without parole sentence will receive one.

23

Under the two-pronged categorical bar analysis, we find that states are rapidly abandoning juvenile life without parole sentences, children are less criminally culpable than adults, and the characteristics of youth do not support the penological goals of a life without parole sentence. Thus, we hold that sentencing juvenile offenders to life without parole or early release is cruel punishment and therefore RCW 10.95.030(3)(a)(ii) is unconstitutional under article I, section 14.

IV. *Even under the* Fain *Proportionality Test, Sentencing a Juvenile Offender to Life without Parole Constitutes Cruel Punishment*

Even if this court applied the *Fain* proportionality test here, we would still find that sentencing a juvenile offender to life without parole violates article I, section 14. First, looking to the nature of the offense, there is no doubt that aggravated first degree murder is the most serious criminal offense. The second factor asks us to look at the legislative purpose behind the *Miller*-fix statute. According to the legislature, the purpose is to require sentencing courts to "take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller*." LAWS OF 2014, ch. 130, § 9(3)(b). Taken together, these factors show that while aggravated murder warrants a serious punishment, youth convicted of the offense have the special protections from the *Miller*-fix statute requiring sentencing courts to consider children's diminished culpability.

The third factor, the punishment juveniles would receive in other jurisdictions, weighs in favor of finding juvenile life without parole sentences cruel punishment and

24

unconstitutional. *See supra* Section III.a. Lastly, the fourth factor directs us to look at the punishment juveniles would receive for other offenses in the same jurisdiction. Juveniles in Washington can be sentenced to life without parole only if they are convicted of aggravated first degree murder. RCW 10.95.030. If a juvenile is convicted of any other crime or combination of crimes, he or she would be eligible for release after 20 years, unless he or she has committed a disqualifying infraction in the prior year. RCW 9.94A.730(1). This extreme jump from eligibility for release after 20 years to life without parole shows the extreme severity of the sentence in the broader context of juvenile sentencing. Thus, it weighs in favor of finding life without parole a disproportionate and cruel sentence as applied to juvenile offenders.

This test shows us that while the offense is serious, the punishment is extreme in comparison to the sentence other jurisdictions would impose and the sentence Washington would impose for other crimes. Even if we applied the *Fain* test to Bassett's categorical constitutional challenge, life without parole is a disproportionate sentence for juvenile offenders, and therefore, RCW 10.95.030(3)(a)(ii) is unconstitutional under article I, section 14.

## CONCLUSION

We hold that sentencing juvenile offenders to life without parole or early release constitutes cruel punishment and, therefore, RCW 10.95.030(3)(a)(ii) is unconstitutional, insofar as it allows such a sentence, under article I, section 14 of the

25

Washington Constitution. We affirm the Court of Appeals' decision to remand to the trial court for resentencing in accordance with this opinion. On remand, the trial court may not impose a minimum term of life as it would result in a life without parole sentence.

WE CONCUR:

Owens, J.

Wiggins, J.

González, J.

Gordon McCloud, J.

Yu, J.

*State v. Bassett (Brian M.)*
(Stephens, J., dissenting)

No. 94556-0

STEPHENS, J. (dissenting)—The majority's decision to invalidate a provision of our *Miller*-fix statute, RCW 10.95.030(3)(a)(ii), and to categorically bar the imposition of a juvenile life without parole (LWOP) sentence purports to rest on article I, section 14 of the Washington State Constitution. However, it offers no basis in state law but is simply a reinterpretation of *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). More precisely, the majority takes *Miller*'s federal constitutional requirement—that a sentencing court consider youth and its attendant characteristics as mitigating factors in exercising sentencing discretion to impose LWOP—and uses it to categorically bar the exercise of such discretion under the state constitution. Not only is this contrary to the holding in *Miller* itself, which does not categorically bar LWOP sentences for juvenile homicide offenders, it also departs from state precedent rejecting similar constitutional challenges and upholding judicial sentencing discretion.

I respectfully dissent. I would hold that the provision of Washington's *Miller*-fix statute, RCW 10.95.030(3)(a)(ii),[1] complies with article I, section 14 and ensures that LWOP will rarely be imposed on juveniles who commit murder. That statute appropriately requires sentencing courts exercising discretion to "take into account mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*, 132 S.Ct. 2455 (2012)." RCW 10.95.030(3)(b). While *Miller* prohibits the imposition of LWOP on "juvenile offenders whose crimes reflect the transient immaturity of youth," *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 734, 193 L. Ed. 2d 599 (2016), it does not categorically prohibit this sentence for all juvenile homicide offenders. In reviewing a juvenile LWOP sentence, the considerations required under RCW 10.95.030(3) modify our traditional state constitutional analysis under *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980). Just

---

[1] Although the Court of Appeals holds that "life sentences without parole or early release for juvenile offenders as allowed under RCW 10.95.030(3)(a)(ii) are unconstitutional," *State v. Bassett*, 198 Wn. App. 714, 743, 394 P.3d 430 (2017), at one point the court also reasons that "[b]ecause we agree that the *Miller*-fix statute violates the Washington State Constitution, we do not reach Bassett's alternative arguments that the statute is unconstitutional under the federal constitution's Eighth and Sixth Amendments." *Id.* at 722; U.S. CONST. amends. VIII, VI. Based on the concise holding, I presume that the Court of Appeals never intended to invalidate the entire *Miller*-fix statute but, instead, only the provision that was before the court. *See id.* at 716 ("Bassett appeals his new sentence and successfully argues that a provision of the *Miller*-fix statute, RCW 10.95.030(3)(a)(ii), violates our State's constitutional prohibition against cruel punishment. . . . We hold that under a categorical bar analysis, the statutory *Miller*-fix provision that allows 16- to 18-year-old offenders convicted of aggravated first degree murder to be sentenced to life without parole or early release violates article I, section 14 of the state constitution prohibiting cruel punishment." (footnote omitted)).

as RCW 10.95.030(3)(a)(ii) complies with the Eighth Amendment under the reasoning in *Miller*, it complies with article I, section 14 of the Washington Constitution. I would reverse the Court of Appeals and uphold the sentencing judge's discretion to impose LWOP on Brian Bassett.

I. The Proportionality Test from *State v. Fain*, as Modified by RCW 10.95.030(3), Governs Review of Sentences under Article I, Section 14 of the Washington Constitution

Washington State has long used the proportionality principles adopted in *Fain* to determine whether punishment is constitutional under article I, section 14 of the Washington Constitution. *See State v. Witherspoon*, 180 Wn.2d 875, 895, 329 P.3d 888 (2014) (Gordon McCloud, J., concurring and dissenting) ("The controlling Washington case interpreting the applicable provision of the Washington State Constitution is *State v. Fain*. *Fain* requires us to do just such a disproportionality analysis now, in reviewing the sentence." (citation omitted)); *see also State v. Ramos*, 187 Wn.2d 420, 454 & n.10, 387 P.3d 650 (2017) (refusing to consider state constitutional argument in part because defendant failed to "address the factors for determining whether a sentence independently violates the Washington Constitution" (citing *Fain*, 94 Wn.2d at 397)). The *Fain* proportionality factors include "(1) the nature of the offense; (2) the legislative purpose behind the [relevant] statute; (3) the punishment defendant would have received in other

jurisdictions for the same offense; and (4) the punishment meted out for other offenses in the same jurisdiction." 94 Wn.2d at 397.

The majority casts aside the *Fain* analysis on the ground that it "does not include significant consideration of the characteristics of the offender class," and is thus "ill suited" to address claims based on "the nature of children." Majority at 15. This fails to appreciate the breadth of the inquiry under *Fain*, which fully incorporates consideration of the unique characteristics of youth under Washington's *Miller*-fix statute, RCW 10.95.030(3).

Following the United States Supreme Court decision in *Miller*, the legislature directed that Washington sentencing courts must consider "mitigating factors that account for the diminished culpability of youth . . . including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated." RCW 10.95.030(3)(b). The Washington *Miller*-fix statute addresses the foundational principle from *Miller* and the previous cases it built on—"that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." 567 U.S. at 474.

Post-*Miller*, our constitutional analysis under *Fain* necessarily incorporates these considerations. The majority repeats the error of the Court of Appeals by

divorcing the *Fain* analysis from *Miller*'s requirements, when we must respect both. Majority at 16 (stating, "a test that does not consider youthful characteristics should not be adopted"); *State v. Bassett*, 198 Wn. App. 714, 738, 394 P.3d 430 (2017) (suggesting *Fain* conflicts with *Miller* by requiring courts "to focus exclusively on the nature of the crime and ignore the nature of the offender"). Although the majority complains that *Fain* fails to consider the nature of children, majority at 15, it ultimately acknowledges that applying *Fain* along with the *Miller*-fix statute actually does require consideration of the characteristics of youth. *See Id.* at 24 ("[W]hile aggravated murder warrants a serious punishment, youth convicted of the offense have the special protections from the *Miller*-fix statute requiring sentencing courts to consider children's diminished culpability."). Properly understood, our *Fain* analysis does not fail to account for youth and its attendant characteristics but, instead, folds these considerations into our constitutional review under article I, section 14.

II.  Our Post-*Miller* State Constitutional Analysis under *Fain* Fully Accounts for Youth and Its Attendant Characteristics in Deciding Whether To Impose LWOP on a Juvenile Homicide Offender

Understanding that adequate sentencing review must account for both *Miller* and *Fain*, there is no basis to abandon our traditional state constitutional analysis. Both the substantive and procedural aspects of the holding in *Miller* may be

harmonized with the *Fain* factors under our analysis. Nothing in *Miller* forecloses individual sentence review. Instead, "*Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption. The fact that life without parole could be a proportionate sentence for the latter kind of juvenile offender does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right." *Montgomery*, 136 S. Ct. at 734. The Court in *Miller* could have extended the categorical reasoning of its earlier juvenile sentencing decisions to entirely eliminate the discretion of a sentencing judge to consider LWOP for juvenile homicide offenders, but it did not. *Miller* examined *Roper v. Simmons*, 543 U.S. 551, 575, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) and *Graham v. Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), in which the Court held, respectively, that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments, and that LWOP is an unconstitutional sentence for juveniles who commit crimes other than murder. In refusing to extend a categorical bar to juvenile LWOP sentences for homicide offenders, the Court in *Miller* upheld the discretion of sentencing judges, guided by consideration of the mitigating circumstances of youthfulness. *See Miller*, 567 U.S. at 483 ("Our decision does not categorically bar

a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty."). *Miller* noted the distinction between a categorical ban on LWOP applied to nonhomicide crimes in *Graham* and allowance of this penalty in light of the additional moral culpability and consequential harm arising from murder. *Miller*, 567 U.S. at 473 (citing *Graham*, 560 U.S. at 69).

We recently recognized that "*Miller*'s procedural requirement for individualized sentencing of juvenile homicide offenders 'does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.'" *Ramos*, 187 Wn.2d at 441 (quoting *Montgomery*, 136 S. Ct. at 735). *Miller* explicitly requires sentencing courts to

> receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including . . . the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." It is also necessary to consider the juvenile's "family and home environment" and "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." And where appropriate, the court should account for "incompetencies associated with youth" that may have had an impact on the proceedings, such as the juvenile's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."

*Ramos*, 187 Wn.2d at 443-44 (citations omitted) (quoting *Miller*, 567 U.S. at 477-78). "[E]vidence of *actual* '"demonstrated maturity and rehabilitation"'" is generally considered later, when it is time to determine whether a former juvenile offender who is up for parole should be given early release." *Id.* at 449 (quoting *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75)). "Whether such evidence should be considered at the time of resentencing to the extent that it bears on the offender's culpability is a question we leave to the discretion of the trial court in each case." *Id.* "[T]he Supreme Court has expressly acknowledged that '*Miller* did *not* require trial courts to make a finding of fact regarding a child's incorrigibility.'" *Id.* at 449-50 (quoting *Montgomery*, 136 S. Ct. at 735).

The majority fails to explain why the line drawn in *Miller* and recognized by this court in *Ramos* is now constitutionally inadequate. It is not enough to say, as the majority does, that we have relied on *Miller* to impose additional restraints on juvenile sentencing. *See* majority at 12. Our cases applying *Miller* all recognize that *Miller* allows sentencing judges the discretion to impose harsh sentences on juvenile offenders, including LWOP in rare circumstances. *See State v. O'Dell*, 183 Wn.2d 680, 698-99, 358 P.3d 359 (2015) ("We hold that a defendant's youthfulness can support an exceptional sentence below the standard range . . . and that the sentencing court must exercise its discretion to decide when that is."); *Ramos*, 187

-8-

Wn.2d at 428 ("[W]here a convicted juvenile offender faces a possible life-without-parole sentence, the sentencing court must conduct an individualized hearing and 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" (quoting *Miller*, 567 U.S. at 480)); *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017) ("In accordance with *Miller*, we hold that sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant, even in the adult criminal justice system."). Legislative changes conforming judicial sentencing practices to *Miller* similarly recognize that judges have discretion to impose LWOP in uncommon cases of 16- and 17-year-olds who commit murder. RCW 10.95.030(3)(a)(ii). There is simply no foundation in Washington law post-*Miller* to support the majority's newfound interpretation of article I, section 14 to categorically prohibit juvenile LWOP sentences.

III. The Majority's *Gunwall* Analysis Ultimately Relies on Reinterpreting *Miller* and Offers No State Law Basis To Categorically Bar Juvenile LWOP for Homicide Offenses

The majority recognizes that a meaningful analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), must focus on "specific applications" of article I, section 14, not general comparisons of state and federal constitutional provisions. *See* majority at 9-10; *Ramos*, 187 Wn.2d at 454 ("Even where it is already

established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications."). Nonetheless, as discussed above, the only authority the majority relies on specific to juvenile sentencing are our prior decisions applying *Miller* and related federal cases, and Washington juvenile sentencing statutes, including the *Miller*-fix statute. Majority at 12-13. That the majority walks through the six *Gunwall* factors[2] cannot obscure the fact that there is no independent source of state law categorically prohibiting LWOP in this context.

Prior to *Miller*, Washington precedent and statutes allowed for juvenile LWOP sentencing on a wider scale. The State correctly points out that "Washington courts have repeatedly rejected constitutional challenges to juvenile LWOP sentences." Revised Suppl. Br. of Pet'r at 10 (citing *State v. Furman*, 122 Wn.2d 440, 458, 858 P.2d 1092 (1993); *State v. Massey*, 60 Wn. App. 131, 145-46, 803 P.2d 340, *review denied*, 115 Wn.2d 1021, 802 P.2d 126 (1990), *cert. denied*, 499 U.S. 960 (1991); *State v. Stevenson*, 55 Wn. App. 725, 737-38, 780 P.2d 873 (1989),

---

[2] The *Gunwall* analysis considers the following factors to determine whether the Washington Constitution provides greater protection than the United States Constitution: (1) "The textual language of the state constitution," (2) "Significant differences in the texts of parallel provisions of the federal and state constitutions," (3) "State constitutional and common law history," (4) "Preexisting state law," (5) "Differences in structure between the federal and state constitutions," and (6) "Matters of particular state interest or local concern." 106 Wn.2d at 61-62 (italics omitted).

*review denied*, 113 Wn.2d 1040, 785 P.2d 827 (1990); *State v. Forrester*, 21 Wn. App. 855, 870-71, 587 P.2d 179 (1978), *review denied*, 92 Wn.2d 1006 (1979)). As the Court of Appeals acknowledged, even after *Miller* "no Washington case has applied the categorical bar analysis." *Bassett*, 198 Wn. App. at 733. To the contrary, our cases have consistently recognized the limited reach of the holding in *Miller* and that our *Miller*-fix statute complies with it. *See Ramos* 187 Wn.2d at 440-53. Nor has our legislature taken the approach that some other states have taken post-*Miller*, of categorically eliminating LWOP as a permissible sentence for all juvenile offenders. Instead, RCW 10.95.030(3)(a) removes LWOP from consideration only for juveniles age 15 and under, and retains judicial discretion to impose LWOP on 16- and 17-year-old homicide defendants in rare circumstances. I thus fail to see how the majority finds evidence supporting a categorical bar in Washington law when these authorities all rely on or respond to *Miller*, which itself imposes no categorical constitutional bar to LWOP for juvenile homicide offenders.[3]

At the end of the day, the majority's circular path of reasoning leads back to *Miller*, and it attempts to reinterpret *Miller* in a way that expands the substantive holding in that case to make it more like *Graham*. The majority ultimately rejects

_____

[3] The majority finds it significant that several states have completely eliminated juvenile LWOP as a discretionary sentence in all circumstances, with most taking this step after *Miller*. Majority at 18 (citing state statutes). It acknowledges, however, that the approach taken by Washington and other states is consistent with *Miller*. *Id*. at 18-19.

*Miller*'s actual holding, requiring individualized review of youth and attendant characteristics for LWOP sentencing of juvenile homicide offenders, because it elevates *Graham*'s reasoning to an absolute. Majority at 15 (citing *Graham*, 560 U.S. at 67). *Graham* appropriately recognized that children are different from adults and that juvenile LWOP sentences often fail to serve valid penological goals. *See Graham*, 560 U.S. at 61. However, the Court in *Graham* made clear that this "categorical bar [to LWOP] relates only to nonhomicide offenses." *Miller*, 567 U.S. at 473 (citing *Graham*, 560 U.S. at 69). Here, of course, we are concerned with homicide crimes, specifically homicide crimes committed by juvenile offenders between the ages of 16 and 18. Notwithstanding *Graham*'s recognition of the mitigating impact of youth and its attendant characteristics, *Miller* determined it is sufficient that sentencers must consider individual differences among juvenile homicide defendants when imposing LWOP sentences. *Id.* at 480. In *Ramos*, we recognized that *Miller* allows for sentencing discretion to impose LWOP on juvenile homicide offenders, consistent with the Eighth Amendment. We refused to entertain the very argument the majority today embraces in the absence of a state constitutional analysis under the *Fain* factors. 187 Wn.2d at 454-55.[4] The

---

[4] We also recognized in *Ramos* that "the *Miller* Court left state legislatures with considerable flexibility to develop their own procedures for implementing its substantive holding." 187 Wn.2d at 440. "[T]he fixing of legal punishments for criminal offenses is a legislative function." *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796

majority's answer to *Ramos*, apparently, is to now say a *Fain* analysis must give way to a categorical analysis. *See* majority at 14-17 (rejecting *Fain* analysis as insufficient to consider the characteristics of youth); *see also Bassett*, 198 Wn. App. at 738 (refusing to apply *Fain*).

Although the majority walks through the *Gunwall* factors to find that article I, section 14 is more protective than the Eighth Amendment to the United States Constitution, majority at 10-13, its reasoning rests entirely on reinterpreting *Miller* to follow the categorical bar approach of *Graham*. The majority is careful not to expressly rely on the single Iowa case to take this approach, *see State v. Sweet*, 879 N.W.2d 811 (Iowa 2016), but it endorses the Court of Appeals' categorical bar analysis that leans heavily on *Sweet*. *See* majority at 14; *Bassett*, 198 Wn. App. at 735. The problem with this analysis is that it uses *Graham*'s general recognition that LWOP is often unconstitutional for children to overrule *Miller*'s specific holding that it is sometimes allowed. *See Sweet*, 879 N.W.2d at 829-30. Reaching such a result by invoking state law rather than resting on federal law provides thin cover.

Washington State law does not categorically bar LWOP for juvenile homicide offenders. We consistently upheld juvenile LWOP before *Miller*, and it remains a

---

(1986). It is "'the function of the legislature and not of the judiciary to alter the sentencing process.'" *Id.* (quoting *State v. Monday*, 85 Wn.2d 906, 909-10, 540 P.2d 416 (1975)).

-13-

constitutionally permissible sentence for some juveniles under *Miller*'s clear holding. Nothing in our subsequent precedent adhering to *Miller* supports using article I, section 14 to expand *Miller*'s holding. I would uphold the constitutionality of RCW 10.95.030(3)(a)(ii) and recognize the discretion of sentencing courts to impose LWOP on juvenile homicide offenders in rare cases such as this.

## CONCLUSION

Bassett, pursuant to the *Miller*-fix statute, was resentenced in 2015 when he was 35 years old. *Bassett*, 198 Wn. App. at 718, 721. Consistent with RCW 10.95.030(3)(b), the resentencing court explicitly considered the required *Miller* factors, including the transient immaturity and impulsivity attendant to youth in general, as well as the evidence Bassett introduced regarding his disposition. The court ultimately accepted the original LWOP sentence, finding that Bassett's conduct in the premeditated murders did not indicate transient immaturity or impulsiveness. This sentence was within the court's discretion, though based on the record a different judge may have imposed a lesser sentence.[5]

---

[5] In his cross petition for review by this court, Bassett challenged the sentencing judge's exercise of discretion. *See* Cross-Pet. for Review (requesting review regarding whether it is constitutional to (1) allow a judge to decide the presence of an aggravating circumstance necessary to impose a juvenile LWOP sentence, (2) allow a sentencing judge to consider information offered as mitigation of punishment into evidence justifying imposition of the most severe punishment possible for a juvenile offender, and (3) sentence a juvenile to LWOP on less than proof beyond a reasonable doubt). We rejected the cross petition, however, and thus the sole issue before us is whether RCW 10.95.030(3)(a)(ii) is

-14-

I would conclude that RCW 10.95.030(3)(a)(ii) is constitutional and would therefore uphold the sentencing court's discretionary decision to impose LWOP on Bassett for the murders of his parents and brother.

---

constitutional. *See* Order, *State v. Bassett*, No. 94556-0 (Wash. Oct. 4, 2017); Pet. for Review at 2 ("Does the provision of the *Miller*-fix statute permitting a sentencing court to impose LWOP upon a juvenile murderer after fully considering mitigating factors that account for the diminished culpability of youth and the chances of rehabilitation violate our state's constitutional prohibition against cruel punishment?").

Stephens, J.

Johnson, J.

Fairhurst, C.J.

Madsen, J.